IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 21-CR-219 (RC) |
| ) | |
| SOPHIA KIM, ) | |
| ) | |
| ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Sophia Kim, by her attorney, David W. Bos, Assistant Federal Public Defender, hereby submits the following memorandum in aid of sentencing in this matter. Pursuant to the sentencing factors set forth in 18 U.S.C. §3553(a), as delineated in *Rita v. United States*, 127 S. Ct. 2456 (2007), *Kimbrough v. United States*, 128 S. Ct. 558 (2007) and *Gall v. United States*, 128 S. Ct. 586 (2007), Ms. Kim respectfully requests that the Court impose a sentence of twenty-four months, followed by a period of five years of Supervised Release, with the special conditions that Ms. Kim pay restitution to the victim in this case, and continue with her gambling addiction treatment. Ms. Kim further requests that the Court recommend to the Bureau of Prisons that Ms. Kim be allowed to participate in the Female Integrated Treatment (FIT) program while serving the incarceration portion of her sentence, as recommended by the Probation Department.1 Ms. Kim submits that the requested sentence is "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. §3553. In support of this request, counsel states:

1. Ms. Kim appears before the Court for sentencing after having pled guilty to one count of bank fraud, in violation of 18 U.S.C. 1344(2).

---

1 As noted by the Probation Department, the FIT program is a residential treatment program that offers integrated cognitive-behavioral treatment for substance abuse disorders, mental illness, and trauma related disorders for female inmates. Pre-Sentence Report (PSR) at ¶139.

2. Ms. Kim is a 60 years old. She is well-educated, the mother of three adult children, the primary caretaker for her elderly parents, and has worked consistently her entire adult life. Ms. Kim has no substance abuse issues and has been fully compliant with all of the conditions of her pre-trail release for nearly two years.

Ms. Kim has demonstrated acceptance of responsibility for her misconduct in this case -- first, to her employer before any criminal charges were brought by the government; and, later, by accepting the government's first, and therefore only, plea offer. Ms. Kim is extremely remorseful for her actions.

3. As discussed in more detail below, Ms. Kim was suffering from an untreated gambling addiction at the time she committed the instant offense. She has been receiving treatment for her gambling addiction for nearly two years. Her treatment includes attending Gamblers Anonymous meetings at least two times a week, and weekly individual therapy sessions with a Licensed Professional Counselor.

## ARGUMENT

When imposing a sentence, the Court must consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for [the applicable offense and the applicable category of defendant as set forth in the United States Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

See 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is *not* an appropriate means of promoting correction and rehabilitation.

See 18 U.S.C. § 3582 (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a) (emphasis added).

### United States Sentencing Guideline Considerations

The PSR calculates Ms. Kim's guidelines range consistent with what the parties estimated in the plea agreement. Once the Court correctly calculates the sentence that the Guidelines recommend, however, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007). Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 128 S.Ct. at 598 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the

punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

Here, when considering the range recommended by the Guidelines, the Court should consider the manner in which the fraud guidelines were developed. These particular guidelines were not designed to serve the purposes of sentencing or based on empirical data regarding past sentencing practices. Instead, the guideline range is driven largely by the amount of the loss. By focusing on this one factor, the guidelines produce a range that is far greater than necessary to promote the goals of sentencing in this matter.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." 28 U.S.C. § 994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with front-line actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(c), 991(b)(2), 994(o), 995(13), (15), (16). The original Commissioners, however, abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate. Instead, the Commissioners purportedly developed the guidelines based on an empirical study of time served for various offenses before the guidelines. *See* U.S.S.G., Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other

frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner; *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007), and when a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109-10.

As discussed below, the fraud guideline used in this case to calculate Ms. Kim's guideline range of imprisonment is not based on empirical data of past practice or on national experience. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1 or its predecessor § 2F1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Pepper v. United States*, 131 S. Ct. 1229, 1247 (2011); *Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Breyer, *supra*, 17 Hofstra L. Rev. at 22-23. The Commission instead required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 0-6 months and no more than 30-37 months for defendants in Criminal History Category I. *See* U.S.S.G. § 2F1.1 (1987). The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." U.S.S.G., ch. 1, intro., pt. 4(d) (1987); *see also* U.S. Sent'g

Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 56 (2004) [hereinafter *Fifteen Year Report*] (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement"). The Commission's deterrence rationale, however, was not based on empirical evidence. Empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).

"[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).

Moreover, the Commission quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased over time, again without any empirical data to support in the increases.

In Ms. Kim's case, those unsupported increases have raised her Total Offense Level an astounding *ten* levels (from 14 to 24).2 Those unsupported increases have also nearly tripled her recommend guideline of imprisonment (from 18-24 months to 57-71 months).

---

2 Under the 1987 Guidelines, Ms. Kim's Base Offense Level would be 6 pursuant to U.S.S.G. §2F1.1. There would be a 9 level increase in the Base Offense Level based on a loss amount of between 1,000,001 and 2,000,000. §2F1.1((b)(1)(J). An additional 2 levels would be added because her offense involved "more than minimal planning." §2F1.1(b)(2). With a three-point reduction for Acceptance of Responsibility, Ms. Kim's Adjusted Offense Level would be 14. An Adjusted Offense Level of 14, coupled with a Criminal History Category of II, *see* PSR ¶59, results in a recommended imprisonment guideline range of 18-24 months.

At the Commission's Economic Crimes Symposium in 2000, at which the issues and questions underlying the Economic Crimes Package were discussed by judges, stakeholders, and academics over a two-day period, a formal question was posed and provided in writing: "[I]f there is a current problem with the guidelines that is in need of repair, is it that fraud and theft are punished too leniently or that drug crimes are punished too harshly?" U.S. Sent'g Comm'n, *Symposium on Federal Sentencing Policy for Economic Crimes and New Technology Offenses* 54 (2000) [hereinafter *Economic Crimes Symposium*].

Speaking on behalf of the Department of Justice, and in response to the moderator's question asking whether economic crimes should be "punished in the same way that we punish drug offenders," *id*. at 55, Assistant Attorney General James K. Robinson stated that "sentences for economic crimes should not be set, in our view, to match sentences for drug crimes," *id.* at 59, but should be set "in terms of the need to fulfill the purposes of sentencing," *id.* at 58. Judge J. Phil Gilbert, speaking on behalf of the Criminal Law Committee of the Judicial Conference, stated that drug crimes are "punished too harshly," high loss fraud offenses are punished "too leniently," and they cannot be compared because they are "apples and oranges." *Id.* at 56. Dr. Mark Cohen, Professor of Economics at Vanderbilt University, stated that "drug offenses are broke so they need to be fixed," but that there was no "evidence that fraud is broke," and summarized research presented at the symposium demonstrating that increasing sentences for fraud would not serve the purpose of deterrence. *Id.* at 65-66, 69.

Nonetheless, as revealed by the question posed by the Commission and its reference to "penalty levels for offenses of similar seriousness sentenced under other guidelines," U.S.S.G., App. C, Amend. 617 (Nov. 1, 2001), the Commission ratcheted up the guideline range based on the guidelines for drug offenses. This alone demonstrates

that the increase was unsound, for the drug guidelines themselves were not based on empirical data or national experience. *See Gall*, 552 U.S. at 46 n.2; *Kimbrough*, 552 U.S. at 96. Instead, they were designed to be "proportional" to statutory mandatory minimums, *see* § 2D1.1 comment (backg'd) (1987), lack any empirical basis, and dramatically increased sentences for drug offenses "far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes." *Fifteen Year Report* at 49. Moreover, contrary to the Commission's vague assertion, the comments the Commission actually received did not indicate that the Commission should increase fraud penalties to approach or match drug penalties.

The explanations offered by the Commission for the various amendments to the fraud guidelines are deficient and inaccurate – the amendments were made not in the exercise of its characteristic institutional role as an independent expert body, but instead based on unsupported signals. The Commission ignored the overwhelming empirical research discussed at the Economic Crimes Symposium, demonstrating that increases in sentence severity, as opposed to certainty, have no deterrent value, and it ignored the actual feedback from the district courts. Though the Guidelines explicitly allowed for *upward* departures when the amount of loss does not "fully capture the harmfulness and seriousness of the conduct," *see* U.S.S.G. § 2F1.1 comment. (n.11) (2000), the sentencing courts granted upward departures in only 1.2 percent of cases sentenced under § 2F1.1 in the year 2000, while they granted downward departures in 11.2% of cases and another 19% received departures for substantial assistance. *See* U.S. Sent'g Comm'n, *2000 Sourcebook of Federal Sentencing Statistics,* tbl. 28 (2000); *see also Economic Crimes Symposium* at 63 (remarks of James Felman, co-chair of the Commission's Practitioner's Advisory Group) (citing similar statistics for fiscal year 1999, and also pointing out that in fraud cases, judges sentenced at the high end of the applicable guideline range less

frequently than average and at the bottom of the range in the majority of cases). This feedback from judges, the institutional actors best suited to make sentencing determinations, did not support any increase.

The 1989 and 2001 increases in the fraud guideline led to the absurd result that first-time, nonviolent fraud offenders were subject to sentences as high as, and sometimes higher than, those imposed on the most violent and serious offenders. *Compare* U.S.S.G. § 2B1.1 (2001) (offense level 30 for loss over $7 million, sophisticated means, abuse of position of trust) *with* USSG § 2A2.1 (2001) (offense level 28 for assault with intent to commit first degree murder); § 2A4.1 (2001) (offense level 24 for kidnapping), USSG § 2K1.4 (2001) (offense level 24 for arson creating substantial risk of death or serious bodily injury), USSG § 2D1.1 (2001) (offense level 30 for trafficking in 3 kilograms of cocaine and possessing a firearm), USSG § 2A1.3   (2001)  (offense level 25 for voluntary manslaughter).

Moreover, while the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of the offense. *See United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004). Defendants rarely set out to defraud others of a specific amount of money; rather, the amount of loss is dependent on the security procedures in place and the point in time when the fraud happens to be detected. *Id.* In many cases, "[h]ad [the

defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more."

Widespread disagreement with the fraud guideline is further evidence that it is unsound. In fiscal year 2010, sentences below the guideline range were imposed in 41% of all fraud cases; 18% were government-sponsored, 23% were non-government sponsored. *See* U.S. Sent'g Comm'n, *Preliminary Quarterly Data Report, Fourth Quarter FY 2010*, tbl.5. In fiscal year 2013, sentences below the guideline range were imposed in 47.4% of all fraud cases; 24.3% were government-sponsored, 23.9% were non-government sponsored. *See* U.S. Sent'g Comm'n, *Sentences Relative to the Guideline Range by Each Primary Offense Category, Fiscal Year 2013*, tbl.27.

> [S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives.

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

There is further support for Ms. Kim's request that this Court give a downward variance. In fiscal year 2013, sentences below the guideline range were imposed in 47.4% of all fraud cases; 24.3% were government-sponsored, 23.9% were non-government sponsored. *See United States Sentencing Commission, Sentences Relative to the Guideline Range by Each Primary Offense Category, Fiscal Year 2013*, tbl. 27. A variance is therefore necessary to not only do justice in this case and but also contribute to the evolution of responsible guidelines. *See Rita*, 551 U.S. at 357-58 (When judges articulate reasons for sentences outside the guideline range, they provide "relevant information to both the court of appeals and ultimately the Sentencing Commission," which "should help the Guidelines constructively evolve over time, as both

Congress and the Commission foresaw."); *see also* Derick R. Vollrath, *Losing the Loss Calculation: Toward a More Just Sentencing Regime in White-Collar Criminal Cases*, 59 Duke L.J. 1001, 1035 (2010) ("Early cases indicate that appellate courts are upholding the decisions of sentencing judges who, based on policy concerns, apply *Kimbrough* to deviate from the white-collar crime Guidelines. If this trend continues, courts could begin to move away from the Guidelines' distracting and destructive emphasis on the loss calculation and toward sentences designed to achieve the purposes set forth in 3553(a).") .

### The Nature and Circumstances of the Offense

Ms. Kim in no way intends to diminish the seriousness nature of this offense, but notes that the crime for which she stands convicted is not crime of violence or drug trafficking offense. The instant charge is a Class B felony and carries no mandatory minimum sentence. With regard to the circumstances of this offense, at the time she committed the instant offense Ms. Kim was is the grips of devastating addiction to gambling. As a result, unlike so many other embezzlement cases the federal courts so often see, Ms. Kim's motive in committing the instant offense was not to support a lavish lifestyle far beyond her means -- at the time she committed the instant offense Ms. Kim was living in a rooming house and had less than $5,000 to her name -- but instead to support her crippling gambling addiction.

### History and Characteristics of the Defendant

Ms. Kim was born in Seoul, South Korea, and became a US citizen in 1988. She is now 60 years old. She is a devoted daughter of two parents who are both in their 80s; and, a mother of three adult children. She has a consistent history of employment and no substance abuse issues. Ms. Kim is presently earning a Master's Degree at the Virginia University of Integrative Medicine. She is on track to receive her degree in 2024.

Ms. Kim has been on GPS monitoring -- without incident -- since February of 2020. Shortly after her arrest, Ms. Kim began attending Gamblers Anonymous meetings. She has been attending Gamblers Anonymous (GA) meetings religiously, at least twice a week, for nearly two years. Initially, she attended the GA meetings in person. At the onset of the Covid-19 pandemic, however, she began attending the GA meetings virtually.

Each GA meeting lasts ninety minutes. Every meeting starts with each participant telling the other members of the group the last time they gambled. For Ms. Kim, that means she is repeatedly reminded of the criminal conduct that now brings her before the Court and the devastating impact her addiction has had on her life. Ms. Kim has found the GA meetings to be extremely therapeutic, and she actively participates in each meeting. As Ms. Kim recently observed to undersigned counsel, there is "no hiding" in the GA meetings.

In addition to her twice a week Gambling Anonymous meetings, Ms. Kim is undergoing individual mental health counseling sessions at the Better Help treatment center. Each week, she meets with a Licensed Professional Counselor for at least thirty-minutes. The Treatment Center also has a Crisis Line which Ms. Kim can call if she needs immediate counseling. Ms. Kim has been receiving individualized counseling for her gambling addition for more than fifteen months.

Ms. Kim's track record the last two years, therefore, demonstrates that she has both the commitment and the capacity to overcome this destructive addiction.

**Need for Deterrence**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tony, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; see also Ziv D. Gabby, Exploring the Limits of the

Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardhouse J. Conflict Repsol. 421, 447-48 (2007) ([Certainly of punishment is empirically known to be a far better deterrent than its severity."). Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id*. While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." Id. at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment.   *See* David Weisberg et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabby, supra, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

**Kinds of Sentences Available**

This Court must now consider all of "the kinds of sentences available" by statute, 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" zones recommend only a lengthy prison term. *See Gall*, 128 S. Ct. at 602 & n.11. Congress has also noted that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to

society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, ' 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. ' 3551 note). Ms. Kim is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society."

**The Purposes of Sentencing.**

A long period of incarceration is not necessary to protect the public from further crimes of Ms. Kim – there will be no further crimes.   The effect that this case has had on her life (and the effect on the lives of her family members) is sufficient to ensure that she will never commit another offense.

Nor is a lengthy sentence of incarceration necessary to deter others. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."  *Id.; see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").   Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University.   *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF.   The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries.   *Id*. at 1.   It examined the effects of changes to both the certainty and severity of punishment.   *Id*.

While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1. Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Further, shorter sentences have an adequate deterrent effect in white collar or business crime cases. It is well established that for white collar defendants relatively short jail sentences can have a significant specific and general deterrence value. *See, United States v. Adelson*, 441 F. Supp.506, 514 (S.D.N.Y. 2006)(in a securities fraud case where the loss amount would have resulted in a lifetime sentence, court sentenced defendant to 42 months in part because "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders.")   In *Adelson*, the Court cited a number of studies demonstrating the deterrent effect of even short prison sentences on business crime defendants, including Richard Frase, *Punishment Purposes*, 58 Stanford L.Rev. 67, 80 (2005) and Elizabeth Szockyj, *Imprisoning White Collar Criminals*, 23S. Ill U.L.J. 485, 492 (1998).   The Adelson Court also noted that the government did not present any evidence or cite to any studies indicating that a sentence of more than three- and- a -half years was necessary to achieve the retributive and general deterrence objectives applicable to a case like this one. And 'necessary' is the operative word, for section 3553(a) expressly dictates that '[t]he court shall impose a

sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of the subsection.' *Adelson*, 441 F. Supp. at 514-515.

### The Need to Provide Restitution to Any Victims of the Offense

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. §3553(a)(7); *see also, e.g., United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); *United States v. Edwards*, 595 F.3d 1004, 1015-1018 (9th Cir. 2010) (5 year term of probation imposed in fraud case despite guideline range of 27 to 33 months, even though defendant had a prior felony theft conviction, so that in part, defendant could pay restitution); and *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution).

Ms. Kim has agreed to pay restitution and is committed to making such payments. Incarcerating her for a significant period of time would only delay her from repaying her debt to the victim in this case.

As the Court well knows, no sentencing decision is simple. This case is no exception; and, indeed may be more difficult than most – given Ms. Kim's prior record for committing essentially the same conduct. A below guideline sentence, however, will serve the dual purpose of ensuring that the financial harm Ms. Kim has caused is rectified, while ensuring that Ms. Kim continues to address the underlying cause of her committing the instant offense.

For the forgoing reasons, pursuant to the sentencing factors set forth in 18 U.S.C. §3553(a) as delineated in *Rita v. United States*, 127 S. Ct. 2456 (2007), *Kimbrough v. United States*, 128 S. Ct. 558 (2007) and *Gall v. United States*, 128 S. Ct. 586 (2007), Ms. Kim

respectfully requests the Court to impose a sentence of twenty four months, followed by five years of Supervised Release with the special conditions that Ms. pay any and all restitution due in this case and continue with her gambling addiction treatment. Ms. Kim further requests that the Court recommend to the Bureau of Prisons that Ms. Kim be allowed to participate in the Female Integrated Treatment (FIT) program while serving the incarceration portion of her sentence, as recommended by the Probation Department. PSR ¶ 139. Ms. Kim submits that the requested sentence is "sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. §3553."

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

"/s/"
_____
David W. Bos
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.   20004
(202) 208-7500