UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 21-0219 (RC) |
| | : | |
| SOPHIA KIM, | : | Re Document No.: 87 |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

DENYING DEFENDANT'S MOTION TO VACATE SENTENCE

**I. INTRODUCTION**

On May 6, 2021, Defendant Sophia Kim pleaded guilty to one count of bank fraud in violation of 18 U.S.C. § 1344(2). *See* Min. Order (May 6, 2021); Judgment at 1, ECF No. 69. She was sentenced to 42 months of imprisonment, 48 months of supervised release, and ordered to pay $1,502,016.21 in restitution. *See* Judgment at 2–3, 6. Before the Court is Kim's motion under 28 U.S.C. § 2255 to vacate her sentence. *See* Mot. Vacate, ECF No. 87. For the reasons set forth below, the motion is denied.

**II. FACTUAL BACKGROUND**

According to the signed Statement of Offense accompanying her plea, Kim worked as the Treasurer and Comptroller for the Universal Ballet Foundation, which operated the Kirov Academy of Ballet ("KAB"), a nonprofit organization in the District of Columbia. *See* Statement of Offense ("SOF") ¶ 1, ECF No. 50. The Statement of Offense explains that between January and September 2018, Kim misappropriated approximately $1,501,285.13 from KAB's bank accounts through unauthorized check, debit card, and credit card transactions, in addition to another $731.08 in associated fees, for a total loss to KAB of approximately $1,502,016.21. *See*

*id.* ¶ 4.  In September 2018, Kim signed a document titled, "Admission of guilt, promissory note, and Deed of Trust," admitting to KAB that she had "been misusing funds of [KAB] which have been entrusted to my care as Comptroller."  *Id.* ¶ 8.  She elaborated that she had been "abusing privileged [*sic*] related to the use of a debit card and made unauthorized withdrawals from KAB bank accounts . . . in the amount of approximately $800,000 to the best of my knowledge" but acknowledged that the "amount could be higher."  *Id.*  She stated that she "used these funds for gambling purposes" and that she "recognize[d] that this may result in criminal charges being lodged against [her] for embezzlement, fraud, negligence, and employee theft."  *Id.*  She also stated that she had "all intention of reimbursing these funds to [KAB] and making [KAB] whole as soon as possible."  *Id.*

In November 2018, the FBI interviewed Kim and she again admitted to "taking approximately $800,000 from KAB by using KAB debit and credit cards, and cash withdrawals" and using it to gamble.  *Id.* ¶ 9.  Kim admitted the same in a follow up interview she requested shortly thereafter, but also explained that, when she was successful in gambling, she "would return those funds to KAB."  *Id.* ¶ 10.  She provided "receipts showing 11 such deposits into KAB bank accounts."  *Id.*  The Statement of Offense concludes by stating that Kim "admits that she personally obtained $1,502,016.21 in criminal proceeds from the crime to which [s]he is pleading guilty" and "admits those funds were obtained from KAB's accounts and funds and were taken by [her] for her personal use and benefit."  *Id.* ¶ 11.

### A.  Plea

The apparent inconsistency in Kim admitting to KAB and the FBI that she took approximately $800,000 but then signing a Statement of Offense admitting to taking over $1.5 million is also reflected in the plea agreement.  The plea agreement includes a Sentencing

Guidelines calculation using a loss amount of "[m]ore than $550,000," instead of the next level of "[m]ore than $1,500,000," while at the same time applying a two-point enhancement because Kim "derived more than $1,000,000 in gross receipts from one or more financial institutions" and including a restitution amount of $1,502,016.21.  *See* Plea Agreement at 2–3, 8, ECF No. 49; U.S.S.G. § 2B1.1(b)(1)(H)–(I), (17)(A).  This issue also arose during the Court's colloquy with Kim during the plea hearing.  After the Government read the Statement of Offense into the record, the Court asked Kim if "there are any corrections or changes to that summary that the government says it can prove that you'd like to make."  Plea Hr'g Tr. at 24, ECF No. 74.  Kim responded that she understood "that the statement of offense is what government [*sic*] believes they can prove in my case."  *Id.*  The Court followed up: "But -- but is it factually true and correct?"  *Id.*  The following exchange ensued:

> THE DEFENDANT: From the day one, I mentioned this to [defense counsel] that the amounts are wrong, but that can be worked out later; that I understand, and that's how I plead guilty, Your Honor.
>
> THE COURT: So are you saying -- you think you took less or more than that?
>
> THE DEFENDANT: Less.  If I could -- if I could explain what I understood is in bank fraud case, it's like, you know, when you have a hundred dollars and you buy a stock, for instance, and sell it and buy it again with the same hundred dollars, buy then stock again and then sell again, say three times, then that's counted as not $100 but it's counted as a $300 transaction in bank fraud case.  That's how it's been calculated.  That's my understanding.  So based on that, yes, I -- I understand that government stated that they can prove the amount that they stated in the statement.
>
> THE COURT: Okay.  But we need to be clear about this because the amounts of the loss is actually very important when it comes to sentencing.  So I -- I understand from what I've read that you -- on a few occasions that you won at gambling, that you returned some of that money to the – to the company, but are you -- are you saying that the amounts that -- putting aside what you may have returned, are you saying that the amount that the government says you took is not the amount you took?
>
> THE DEFENDANT: Factual fact, I know it's not the correct amount, Your Honor.  But I understand -- you know, the letter that the company presented it to me to sign, they did

3

>the work -- numbers work and I agreed.  That's how I signed the letter with the – the company that stated $800,000.  It's not much different from there.
>
>But, again, I understand in a bank fraud case, the -- the charge is -- I never saw the -- the bank statements.  So I never saw the documents, but I understand the government stated that's the amount they can prove to charge me based on the -- the logic that they have.  As I explained earlier with the $100, if you have it to buy a stock and sell it three times, it's counted at 300, not 100. I don't know about the law, but that's what I understand about bank fraud case so --
>
>THE COURT: And I'm not asking you about the law.  And this is a case where it's -- putting aside the money that you may have returned, we're just talking about the money that you actually took in the first place.  Are you saying that you did not take the amount of money that the government says it can prove at trial?
>
>THE DEFENDANT: That's correct, Your Honor.

*Id.* at 24–26.  The Court then asked Kim's counsel how he "would like to deal with this," to which Kim's counsel responded:

>So, Your Honor, if the Court will take a look -- we anticipated that this might be an issue. It's in the plea agreement that the specific loss amount is -- is more than $550,000, and under the guidelines, the next increase of the offense level would be at the 1.5 million level; so that this -- this will not affect the guideline calculation in the case.

*Id.* at 26.  The Government then explained:

>And, Your Honor, from the government, I had taken over this case from another AUSA, but from speaking with folks in the office and speaking with [defense counsel], we agreed -- initially the amount was slightly less than 1.5 million, is my understanding. And then subsequent to making the plea offer, we determined that it was a little bit above 1.5 million.  But in order to stand by our agreement and the representations we initially made, we agreed with defense counsel that we would agree to a loss amount that was at the -- in excess of 550,000 but less than the 1.5 million.  So the total amount for the purposes of sentencing would not make a difference, nor would it make a difference as to the actual elements of the offense.

Id*.* at 26–27.

After clarifying that the Government was still "seeking restitution and forfeiture in an amount greater than 1.5 million," the Court inquired whether Kim would be "challenging the restitution or forfeiture amount at sentencing."  *Id.* at 27.  Kim's counsel responded: "No, Your

4

Honor. Again, it's because there's this dispute that we structured the plea agreement in the way that it is." *Id.* From there, the Court turned back to Kim:

> THE COURT: Okay. So, Ms. Kim, putting aside whether you think the loss was over $1.5 million, do you agree that the loss was over $550,000?
>
> THE DEFENDANT: Yes, Your Honor, I agree with that.
>
> THE COURT: How much -- approximately how much do you think it was?
>
> THE DEFENDANT: It's about 800,000, give or take. The company -- the financials should say very clearly it comes down to later, but that's the amount. . . .

*Id.* at 27–28. Both parties then agreed that "that's sufficient for our purposes today." *Id.* at 28.

Next, the Court engaged in a colloquy to determine Kim's understanding of the plea agreement and willingness to enter into it. The Court's questions included, in relevant part, whether Kim read the plea agreement carefully; whether she authorized her counsel to sign it on her behalf; whether the written agreement encompassed all promises made by the government; whether she understood that she could receive a maximum sentence of 30 years in prison, and specifically that the "money is not the only issue here" and she "could be sentenced up to 30 years in prison for part of this" and whether she understood that she would be ordered to pay restitution, and specifically that she had agreed to pay $1,502,016.21. *Id.* 28–31. Kim responded in the affirmative to each question. *Id.*

The Court next reviewed the Sentencing Guidelines. The Court explained that the Guidelines "are advisory, but they must be consulted by the Court in determining the appropriate sentence in a case." *Id.* at 34. Accordingly, the Court explained that it would

> assess and determine the proper sentence in this case by reference to and in consideration of the guidelines in the first instance, and, and while all of us, the Court, the prosecutor, defense counsel, and even you, based on prior calculation have some idea based on your criminal history and the nature of this offense what the sentencing range under the guidelines is going to be, nothing is certain until the probation office submits a presentence report to me.

*Id.*  The Court explained that "[b]oth sides will have a chance to request changes in [the presentence report] or object to portions of it."  *Id.*

The Court next asked a series of additional questions confirming Kim's understanding of the specific contents of the Plea Agreement, including in relevant part whether Kim had seen the "sentencing guidelines estimates in [her] plea agreement;" whether she understood that the Plea Agreement "waives the right to appeal or collaterally attack the sentence except for very, very limited circumstances" and whether she had discussed those waivers with her attorney; and whether she understood that, "if the proper guidelines range that [the Court] determine[s] is higher than you expected, as [the Court] warned it could be, or the sentence [the Court] impose[s] is more severe than you expected . . . you are still going to be bound by your guilty plea and you will have no right to withdraw it."  *Id.* at 35–37.  Again, Kim responded to each question in the affirmative.  *Id.*

Finally, the Court concluded by asking whether "anyone . . . promised or suggested to you that merely because you are pleading guilty [the Court] will give you a lighter sentence;" whether "anyone has made any promises to you as to what sentence [the Court will] impose in this case if [the Court] accept[s] your guilty plea;" whether "anyone forced, threatened, or coerced you in any way into entering this plea of guilty;" and whether there was "anything else that you do not understand about this proceeding or about your plea in this case."  *Id.* at 38–39.  Kim responded to each of these questions in the negative.  *Id.*

### B.  Sentencing

After the plea hearing, the Court entered a Sentencing Scheduling Order in accordance with the timelines set forth in Fed. R. Crim. P. 32 and Local Criminal Rule 32.  *See* Sentencing Scheduling Order, ECF No. 51.  The Order required the Probation Office to disclose the draft

presentence report ("PSR") by August 9, 2021, required counsel to submit any objections to the draft report by August 23, 2021, and required Probation to disclose the final PSR by August 30, 2021. *Id.* Probation disclosed the draft PSR on August 10, 2021. *See* Draft Presentence Report, ECF No. 56. The draft report explained that the Probation Office's Guidelines calculation differed from that reflected in the Plea Agreement in two important ways:

> The sentencing guidelines range calculated by the US Probation Office differs from that estimated in the plea agreement. Specifically, the US Probation Office assessed a 16-level enhancement pursuant to §2B1.1(b)(1)(I) because the defendant is accountable for a total loss of $1,502,016.21. Notably, the Government advised US Probation Office that the plea agreement (which includes a lower loss amount) was agreed to prior to discovering the loss amount was in fact higher.
>
> Further, the US Probation Office did not include a two-level enhancement for substantial financial hardship, pursuant to §2B1.1(b)(2)(A)(iii). US Probation has not been provided with any evidence that the victim endured substantial financial hardship as a result of the defendant's conduct in this case. As previously noted, US Probation is awaiting a victim impact statement from the victim.

*Id.* at 32. However, the draft report noted that, "despite the US Probation Office's calculation differing from that estimated in the plea agreement, the guidelines level remains 24" and therefore "the estimated sentencing guidelines range and applicable fine range remain the same." *Id.*

Kim's counsel declined to make any objections to the draft report and never returned the "Receipt and Acknowledgement form" attached to the draft report.[1] *See* Final Presentence Report at 37, ECF No. 59. Accordingly, the final PSR, filed August 30, 2021, contained the same language quoted above from the draft report. *See id.* at 32. Kim's sentencing submission stated that "[t]he PSR calculates Ms. Kim's guidelines range consistent with what the parties

---

[1] That form echoed the Sentencing Scheduling Order's requirement that counsel "submit any material inaccuracies or disputes in writing by **August 23, 2021**" to the Probation Office. *See* Draft Presentence Report at 37 (emphasis in original).

estimated in the plea agreement." Def.'s Sentencing Mem. at 3, ECF No. 63. The memorandum argued that because "the guideline range is driven largely by the amount of the loss" it "produce[s] a range that is far greater than necessary to promote the goals of sentencing in this matter." *Id.* at 4.

### III.  LEGAL STANDARDS

Under 28 U.S.C. § 2255, a prisoner serving a federal sentence may move to vacate, set aside, or correct a sentence that was "imposed in violation of the Constitution or laws of the United States," "that the court was without jurisdiction to impose," that was "in excess of the maximum authorized by law," or that "is otherwise subject to collateral attack." § 2255(a). The court must grant a hearing to determine the issues and make findings of fact and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." § 2255(b).

To obtain relief, the defendant "must clear a significantly higher hurdle than would exist on direct appeal," *United States v. Frady*, 456 U.S. 152, 166 (1982) and the circumstances under which a guilty plea may be subject to collateral attack are "strictly limited," *Bousley v. United States*, 523 U.S. 614, 621 (1998). *See also Hill v. United States*, 368 U.S. 424, 428 (1962) (explaining that relief under § 2255 is only appropriate in "exceptional circumstances" involving a "fundamental defect which inherently results in the complete miscarriage of justice, or an omission inconsistent with the rudimentary demands of fair procedure") (quotations omitted). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate . . . 'cause' and actual

'prejudice . . . .'"[2] *Bousley*, 523 U.S. at 622.  That is, for a procedurally defaulted claim, the defendant must show "'cause' for [the] failure to raise the issue at trial and on direct appeal," and "'actual prejudice' resulting from the [alleged] errors." *United States v. Cook*, 130 F. Supp. 2d 43, 45 (D.D.C.2000), *aff'd*, 22 Fed. App'x 3 (D.C. Cir. 2001).

An exception to the procedural default rule is that, for a claim of ineffective assistance of counsel, the defendant "need not show 'cause and prejudice' for not having raised such claims on direct appeal, as these claims may properly be raised for the first time in a § 2255 motion." *Id.* (citation omitted).  A defendant claiming ineffective assistance of counsel must show (1) "that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms," and (2) "that this error caused [him] prejudice." *United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008) (citation omitted).  With respect to the performance prong, the defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.  With respect to the prejudice prong, the defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.  That is, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

---

[2] Claims of actual innocence are also cognizable on collateral review even if not raised below, but Kim makes no claim of actual innocence here.  *Bousley*, 523 U.S. at 622.

## IV.  ANALYSIS

The Court first attempts to construe Kim's various pleadings before turning to substantive analysis of her claims.  Kim submitted a *pro se* form motion under § 2255, *see* Mot. Vacate, together with an attached affidavit, *see* Kim Aff., ECF No. 87-1, and memorandum in support drafted by counsel, *see* Mem. Supp. Mot. Vacate ("Mem. Supp."), ECF No. 87-2.  Through counsel, she later submitted a supplement to her motion.  *See* Suppl. Mem. Supp. Mot. Vacate ("Suppl. Mem."), ECF No. 95.  The *pro se* motion states two grounds for relief: (1) that she was denied the opportunity to review case discovery; and (2) that defense counsel failed to review the PSR or sentencing memorandum with her.  *See* Mot. Vacate at 5–6.  Kim's attached affidavit makes clear that both claims sound in ineffective assistance of counsel ("IAC").  *See* Kim Aff. at 1, 4 (explaining her "request for review of this case on inadequate counsel" and stating, "I think I got railroaded because of inefficient [*sic*] assistance of counsel").  The memorandum in support, drafted by counsel, additionally claims that Kim's guilty plea was not knowing and voluntary, *see* Mem. Supp. at 4, but the supplemental memorandum only speaks to the IAC claim.  Perhaps to reconcile this inconsistency, Kim's reply, submitted through counsel, seems to connect the IAC claim to the involuntary plea claim, *see* Reply Supp. Mot. Vacate ("Reply") at 1 (arguing that counsel's failure to permit Kim to review the discovery rendered the guilty plea not "knowing and intelligent"), but only presses the IAC claim as the ground for relief, *see id.* at 8 ('The Court is left with the two issues posited by *Strickland*. Was counsel's performance deficient . . . and whether the deficient performance prejudiced the defense.").  The Court construes Kim's intermittent claim that her plea was not knowing and voluntary as in aid of her IAC claim, which the Court addresses at length below.  *See, e.g.*, *Moore v. United States*, 881 F.

Supp. 2d 125, 131 (D.D.C. 2012) (defendant claiming that counsel's deficient performance rendered his plea not knowing and voluntary).

However, out of deference to the special role of habeas corpus as "the precious safeguard of personal liberty," *Bowen v. Johnston*, 306 U.S. 19, 26 (1939),[3] the Court also considers Kim's involuntary plea claim as if raised as a standalone ground for relief. This consideration need only be brief. First, in the plea agreement Kim waived "any right to challenge the conviction entered or sentence imposed under this Agreement or otherwise attempt to modify or change the sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 . . . except to the extent such a motion is based on newly discovered evidence or on a claim that your client received ineffective assistance of counsel." Plea Agreement at 7. Kim's argument that she did not have an opportunity to review the existing discovery in her case is, by nature, not based on newly discovered evidence. Relatedly, notwithstanding Kim's disagreement with the Government's loss calculation, she makes no allegation that she did not understand the appeal waiver, and the Court's colloquy with her on this point confirms that she did.[4] *See* Mem. Supp. at 3–4; Reply at 1; Plea Hr'g Tr. at 35–

---

[3] "Although not formally denominated as a writ of habeas corpus, '[a]t its heart, § 2255 is essentially a modified habeas provision,' and as a remedy, it is intended to be as broad as habeas corpus.'" *Pradelski v. Hawk-Sawyer*, 36 F. Supp. 2d 1, 2 (D.D.C. 1999) (quoting *Boyer v. Conaboy*, 983 F. Supp. 4, 7 (D.D.C. 1997) (internal quotation omitted)).

[4] Moreover, the record makes clear that Kim voluntarily and knowingly admitted her guilt to the substantive offense, and that in doing so she fully understood that her plea did not guarantee a particular sentence. Plea Hr'g Tr. at 28–31, 35–37 (Kim acknowledging the Court's statements that "money is not the only issue here" and that she "could be sentenced up to 30 years in prison for part of this," and further that "if the proper guidelines range that [the Court] determine[s] is higher than [she] expected, as [the Court] warned it could be, or the sentence [the Court] impose[s] is more severe than [she] expected . . . [she is] still going to be bound by [her] guilty plea and [she] will have no right to withdraw it"); *see also* Plea Agreement at 4 ("Your client understands and acknowledges that the Estimated Guidelines Range calculated above is not binding on the Probation Office or the Court").

11

37. Accordingly, the waiver bars her claim. *See United States v. Guillen*, 561 F.3d 527, 529–30 (D.C. Cir. 2009) ("If the record shows that the defendant knows what he is doing and his choice is made with eyes open, then the Court will enforce an anticipatory waiver." (cleaned up)); *United States v. Farley*, 72 F.3d 158, 163–64 (D.C. Cir. 1995) ("'[T]he representations of the defendant [at a plea hearing] as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceeding' and the defendant's 'declarations in open court carry a strong presumption of verity.'" (quoting *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). Even if it did not, the claim is procedurally defaulted for Kim's failure to press it on direct appeal, as she has made no showing of cause to explain that failure. *See* Order Granting Def.'s Mot. Voluntarily Dismiss App., ECF No. 88-1; Mem. Supp. at 1 (explaining Kim's plan to voluntarily dismiss her appeal).

### A.  IAC Claim

Turning to Kim's IAC claim, the Court finds that, regardless of whether Kim could establish that trial counsel was deficient, the record "conclusively show[s]" that her defense was not prejudiced as a result, so she is not entitled to a hearing or relief under 28 U.S.C. § 2255.

With respect to deficiency, Kim alleges that trial counsel's performance was lacking for two main reasons: (1) trial counsel refused to show Kim the bank and credit card statements produced in discovery or to challenge the Government's loss calculation based on that discovery, *see* Mot. Vacate at 5; Kim Aff. at 1; Mem. Supp. at 3–4; Suppl. Mem. at 5; Reply at 3; and (2) trial counsel generally failed to communicate effectively with Kim, including failing to provide her a copy of the PSR or her sentencing submission until two days after sentencing, *see* Mot. Vacate at 6; Mem. Supp. at 5; Reply at 6.  More specifically, she alleges that she informed trial counsel that she "wanted to review the financial documents the government used to charge [her]

with more than $1,500,000" in losses, so she could bring to bear her "over 30 years" of experience in the "accounting/banking field" in scrutinizing that calculation. Kim Aff. at 1. She states that KAB "simply did not have that kind of money during that period" so she knew the "amount of over $1,500,000 [was] wrong." *Id.* She says she told trial counsel that she would come to his office to review the bank and credit card statements produced in discovery, but "he refused to show those to [her] saying that he agree[d] with the prosecutor's amount." *Id.* When trial counsel presented her with a plea offer, she "asked him again about adjusting the amount," to which he responded that it "would be worked out after she agreed to it." *Id.* at 2. Then, she alleges that trial counsel failed to provide her with the PSR or her sentencing submission before the sentencing date, preventing her from pointing out important grounds on which to object to the PSR or improve the sentencing submission—for example, that the PSR "had the wrong amount." *Id.*

Correspondingly, Kim argues that these deficiencies prejudiced her defense because (1) she is skilled in accounting and if she had the chance to analyze the discovery, she would have proven that the loss amount was less than the Government alleged, which would have resulted in a lower guidelines range calculation and restitution amount, *see* Mot. Vacate at 5; Kim Aff. at 1, Mem. Supp. at 4–5; Suppl. Mem at 1–5; Reply at 3; and (2) similarly, if she had the chance to review the PSR and sentencing submission, she would have been in a position to object to the loss amount used to calculate the guidelines range in the PSR and correct errors in the sentencing submission. *See* Mot. Vacate at 6; Kim Aff. at 2–3; Mem. Supp. at 5.

These allegations have some initial purchase. In the supplement to her motion, Kim provides a financial analysis of the discovery materials she claims she was prevented from reviewing before pleading guilty. *See* Suppl. Mem. at 1–3; Ex. A to Suppl. Mem., ECF No. 95-

2.  In the analysis, Kim finds that the Government attributed transactions to her that she did not execute and failed to credit funds she returned to KAB, resulting in a calculation overstating the actual loss amount by $463,497.67.  *See* Suppl. Mem. at 2; Ex. A to Suppl. Mem. at 1.  Kim states that she "would have disputed" the Government's loss calculation "had she been given the opportunity to review discovery by her previous counsel."  Suppl. Mem. at 1.  In addition, the Government acknowledges that, after "[f]urther investigation by the FBI post-sentencing," it failed to account for approximately ten transactions in which Kim returned money to KAB, and therefore that its loss calculation was overstated by approximately $181,000.  Gov't's Opp'n at 3, ECF No. 97.[5]  It further acknowledges that, "[h]ad either party brought that fact to the PSR

---

[5] Kim's Reply argues that the Government's miscalculation represents a "misrepresentation" that renders her guilty plea not knowing and voluntary under the standard articulated in *United States v. Pollard*, 959 F.2d 1011, 1021 (D.C. Cir. 1992) (citing *Brady v. United States*, 397 U.S. 742, 747 (1970)).  *See* Reply at 7.  But in *Pollard* the D.C. Circuit explained that only "coercive" conduct by the government renders a plea involuntary, and as such "[a]lmost anything lawfully within the power of a prosecutor acting in good faith can be offered in exchange for a guilty plea."  *Pollard*, 959 F.2d at 1021.  Kim does not allege that anything was offered to her in exchange for her plea or that the Government otherwise acted in bad faith to coerce her plea, so *Pollard* is inapposite.  In addition, Kim's Reply cites to *United States v. Nelson*, 979 F. Supp. 2d 123 (D.D.C. 2013), in which the court found that the prosecution's failure to disclose an exculpatory email constituted a violation under *Brady v. Maryland*, 373 U.S. 83 (1963) that rendered the guilty plea involuntary, and that such a violation was cognizable under § 2255.  *See* Reply at 7; *Nelson*, 979 F. Supp. 2d at 135–36.  Kim contends that this situation is similar because the Government "misrepresented the completeness of the discovery by omitting additional deposits of at least $181,000 even though they had that information in their possession."  Reply at 7.  But the record indicates that Kim herself provided the Government with "receipts showing 11 such deposits into KAB bank accounts" before she pleaded guilty, and Kim presents no evidence that the Government possessed other exculpatory material that it did not disclose at the time of the plea.  Statement of Offense ¶ 10; *see* Gov't's Sentencing Mem. at 4, ECF No. 61.  Indeed, the entirety of Kim's motion, the attached affidavit and memorandum in support, and the later-filed supplemental memorandum are devoted to arguing that the key to a more lenient sentence laid in the discovery that was produced, if only she had been able to review it.  *See generally* Mot. Vacate; Kim Aff.; Mem. Supp.; Suppl. Mem.; *see also* Status Conf. Tr. at 2, ECF No. 80 (trial defense counsel explaining that the Government "graciously provided us a fair amount of discovery" and seeking a continuance to permit review of the discovery).  Regardless, as explained below, Kim has not demonstrated prejudice even if the Government's miscalculation did amount to a *Brady* violation.

writer's attention, it is unlikely that the PSR would have calculated the loss amount to be over $1,500,000." *Id.* at 30.

Ultimately, however, Kim was not prejudiced by trial counsel's alleged failures to communicate or to conduct or facilitate close analysis of the discovery and challenge the Government's or the Probation Office's loss calculation. First, with respect to her decision to plead guilty, it is implausible that Kim would have proceeded to trial even if the Government adopted her proposed loss amount of $1,038,208.61. *See* Ex. A to Suppl. Mem. at 1. That is because the Plea Agreement *did* reflect that approximate loss amount: the agreed upon guidelines range used a loss amount of between $550,000 and $1.5 million and applied a two-point enhancement for gross receipts in excess of $1 million, both of which presumably still would have applied using Kim's preferred loss amount.[6] *See* Plea Agreement at 2–3. At the same time, the evidence against Kim—including two confessions to the FBI—was overwhelming, and the benefits of pleading guilty were substantial. *See* Gov't's Opp'n at 28 ("Had defendant gone to trial, her offense level would have been three levels higher, resulting in an increased Guidelines range from 57-71 months to 78-97 months."). The Court therefore finds that the record conclusively shows that Kim suffered no prejudice as to her decision to plead guilty from any of the alleged failures of trial counsel.

The Court reaches that same conclusion as to the sentencing phase. The Government acknowledges that, had defense counsel objected to the loss amount used to calculate the

---

Accordingly, as Kim acknowledges elsewhere in her Reply, the Government's inflated loss calculation is relevant for purposes of the present motion only insofar as defense counsel's alleged failure to scrutinize and challenge it bears on her IAC claim. *See* Reply at 3 ("Counsel's ineffective assistance resulted in her case moving forward with these miscalculations by the government included in the case.").

[6] It bears notice that Kim's current assertion that the true loss amount is in excess of $1 million is up substantially from her previous position that it was approximately $800,000.

15

Guidelines ranges in the draft PSR, the final PSR likely would have used a loss amount below $1.5 million. *See* Gov't's Opp'n at 30. There is a reasonable probability, therefore, that the PSR would have calculated an offense level of 22, instead of 24. *See* U.S.S.G. § 2B1.1(b)(1). But the Court, taking into account not only the Guidelines range but "all the other relevant factors under [18 U.S.C. §] 3553(a)," Sentencing Hr'g Tr. at 6, 22–27, ECF No. 73, sentenced Kim to 42 months of imprisonment, a sentence four months *below* the applicable Guidelines of 46–57 months even using offense level 22. *See* Draft Presentence Report at 11–12; U.S.S.G. § 5A. Whether the Probation Office used a loss amount just under $1.5 million, as the Government acknowledges it likely would have, or just over $1 million, as Defendant claims it should have, the Court's assessment that the loss amount was "large" would not have changed and the Court would not have imposed a carceral sentence shorter than 42 months.[7] Sentencing Hr'g Tr. at 25; *see Pollard*, 959 F.2d at 1031 ("'[T]he judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion . . . .'" (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977)); *cf. Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016) (explaining that, even in the context of a direct appeal of a sentence imposed using an erroneous calculation of the defendant's criminal history points, "[t]here may be instances when . . . a reasonable probability of prejudice does not exist," such as when "the district court thought the sentence it chose was

---

[7] Kim also claims that that the lower loss amount "certainly would have affected the restitution amount." Suppl. Mem. at 5. Setting aside Kim's statement during the plea hearing that she "understood" that, upon pleading guilty, she would "have actually already agreed to a restitution amount of $1,502,016.21," Plea Hr'g Tr. at 31, it is well established that "challenges to restitution orders are not cognizable under 28 U.S.C. § 2255." *United States v. Wilkins*, 734 Fed. App'x 1, 5 (D.C. Cir. 2018), *cert denied*, 139 S. Ct. 347 (2018); *see United States v. Gray-Burriss*, No. 10-cr-178, 2020 WL 5891449, *2 (D.D.C. Oct. 5, 2020) ("Because 'a claim disputing a restitution order in the circumstances here does not challenge any aspect of the government's custody over the defendant' such claims 'therefore may not be brought under § 2255" (quoting *Wilkins*, 734 Fed. App'x at 5)).

appropriate irrespective of the Guidelines range"); *United States v. Gray-Burriss*, 791 F.3d 50, 59 (D.C. Cir. 2015) (explaining, in remanding a direct appeal from a conviction and sentence for fraud and embezzlement, that "the district court may determine whether, in its discretion, any lower loss findings should affect the defendant's term of incarceration").[8]  Accordingly, regardless of whether trial counsel's performance was deficient, Kim has failed to demonstrate prejudice.  Her motion to vacate her sentence based on ineffective assistance of counsel therefore must be denied.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Vacate Sentence, ECF No. 87, is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 11, 2023                                                                 RUDOLPH CONTRERAS
                                                                                      United States District Judge

---

[8] Considering the *Gray-Burriss* defendant's § 2255 motion years later, the district court explained that "the ultimate sentence would not have differed even if the challenged contract amounts had been excluded from the loss calculation." *Gray-Burriss*, 2020 WL 5891449, at *2 n.3.